# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: SA-23-CR-00620-XR** |
| **JANET YAMANAKA MELLO,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW the United States of America by and through the United States Attorney for the Western District of Texas and the undersigned Assistant United States Attorney and submits to the Court this Sentencing Memorandum. The Government requests that the Court sentence Defendant, Janet Yamanaka Mello, to a sentence of imprisonment of 235 months, which constitutes an upward variance from the Guideline range as calculated by the Government.[1] Additionally, the Government requests the Court order restitution in an amount agreed upon by the parties, a money judgment as agreed by the parties, and forfeiture as agreed by the parties and any term of supervised release recommended by Probation. In support, the Government shows as follows:

## INTRODUCTION

Over the course of six years, the Defendant stole nearly $109 million dollars that was meant to care for and comfort the children of military service members stationed through the world. She did this by betraying the credibility and trust she had accumulated through many years as a

---

[1] The Government has included an objection to the PSR in this Memorandum. 210 months constitutes the high-end of the Guideline range as calculated by the Government if the objection is sustained. Therefore, the Government is requesting a variance of 25 months for a total of 235 months.

civilian Army employee. She then took the money she stole and, along with her husband, embarked on a years-long shopping spree in which they accumulated millions of dollars in real estate, jewelry and vehicles. A sentence of 235 months is more than appropriate under these circumstances.

## BACKGROUND

The 4-H Military Partnership Grant was a program wherein 4-H, the United States Department of Agriculture, and U.S. Army Child, Youth and School (CYS) Services worked together to provide meaningful youth development opportunities for military-connected children. The partnership was funded by the Army, Navy and Air Force. Kansas State University administered the grant program through 4-H Military Liaisons and land-grant universities in each state. The faculty and staff at these land grant universities provided training and curriculum to military partners who would then help military-connected youth engage in 4-H projects. The entities trained by these universities were eligible to receive grant funds for the purpose of executing the kinds of experiences envisioned by the 4-H program.

For many years, the Defendant worked for the U.S. Army Installation Management Command (IMCOM) at Fort Sam Houston in San Antonio, Texas as a CYS Financial Program Manager. Part of her job as a Financial Program Manager was to determine whether 4-H Military Partnership Grant program funds were available for the various entities that applied. Once the Defendant determined grant funds were available, her supervisor would approve the awarding of the funds to the applicant entity. The award package, which included a memo signed by the Defendant indicating funds were available, was then sent to the Defense Financial Accounting Service (DFAS) with instructions to issue a check to the applicant entity in the amount specified in the award package. DFAS would then mail the check to the entity per the shipping instructions in the memo.

In or around December 2016, the Defendant formed a business she called Child Health and Youth Lifelong Development (CHYLD). However, CHYLD was not an actual business. It was a figment of the Defendant's imagination that she used to steal money she believed she somehow deserved more than the military connected families for whom it was intended. The Defendant used her position as a CYS Financial Program Manager to steal the money, and, the Defendant, like any common criminal, spent the stolen money extravagantly, purchasing millions in high-end jewelry, clothing, vehicles, and real estate.

As with many criminals, she betrayed those closest to her in the process. Using her years of experience, expert knowledge of the grant program, and accumulated trust within IMCOM, the Defendant drafted fraudulent memoranda indicating CHYLD was approved to receive grant funds under the 4-H Military Partnership Grant program and that grant funds were available. While many of these memos were submitted to the Defendant's supervisor for approval, there were several instances where the Defendant forged her supervisor's digital signature and then submitted the award package to DFAS directly. When she did not forge her supervisor's signature, the Defendant took advantage of the trust she had developed over the years with her supervisors and co-workers to secure the necessary approvals. After either receiving the necessary approvals or forging the necessary signatures, the paperwork was then passed on to DFAS for payment. No one ever questioned the submission of the payment requests because the Defendant was seen as a subject matter expert within her office.

Based on the Defendant's lies contained within these memoranda, DFAS sent the checks in the amounts requested to a UPS Store mailbox in San Antonio. The mailbox was rented by the Defendant. Once the check was received, the Defendant would deposit the check into a bank account she owned and controlled. The Defendant then spent the money on clothing, jewelry,

vehicles, and real estate. All in all, the Defendant went through this process over forty times during a six-year period, stealing nearly $109 million in the process. The military families who were actually meant to benefit from this money got nothing.

In addition to her extravagant spending, the Defendant lied on her taxes, failing to claim as income the nearly $109 million she stole. This resulted in a tax loss of over $31 million.

Based on these facts, and for the reasons set forth below, the Government now requests the Court sustain its objection to the calculation of the Guideline range in the PSR and impose a sentence of imprisonment of 235 months, in addition to the restitution, money judgment, and forfeiture agreed upon by the parties and any term of supervised release recommended by Probation.

## LEGAL AUTHORITY

### A. Objections to the PSR

On June 11, 2024, Probation made the initial draft of the PSR available to the parties. On June 12, 2024, the Government submitted to Probation a proposed change to the PSR. While the final PSR has not been produced to the parties to date, counsel for the Government was informed on July 16, 2024 that the PSR would not be amended to incorporate the Government's proposed change and that the proposed change would be submitted to the Court as an objection. On July 16, 2024, counsel for the Government sent the same proposed change to counsel for the Defendant. For the reasons set forth below, the offense level calculation in the PSR does not account for additional Specific Offense Characteristics, the Government's objection should be sustained, and the Guideline range should be calculated at 168 to 210 months.

### 1. Application of § 2B1.1(b)(9)(A)

The Government objects to the non-application of Guideline Section 2B1.1(b)(9)(A). (See PSR at ¶55-80.) Section 2B1.1(b)(9)(A) allows for a two-level increase as a result of any misrepresentations made by the Defendant indicating she was acting on behalf of a government agency or educational organization. Here, it is undisputed that the Defendant represented in the memos sent to DFAS that she was acting on behalf of the U.S. Army, IMCOM G9, when, in reality, she was acting on her own behalf. An example of one of these memos is included here:



**DEPARTMENT OF THE ARMY**
US ARMY INSTALLATION MANAGEMENT
COMMAND 2405 GUN SHED ROAD
JOINT BASE SAN ANTONIO FORT SAM HOUSTON, TX
78234-1223

AMIM-WRC                                                    28 NOV 2022

FOR EXPANSION OF MILITARY PARTNERSHIPS

SUBJECT: IB1 Funding Authorization for Military Youth Partnerships # 23-063

1. Request a check be made in the amount of $5,864,669.44 to Child, Health, and Youth Lifelong Learning Development from the Installation Management Command (IMCOM) MWR Fund (IB1). Please send FEDEX to Child, Health and Youth Lifelong Learning Development Office, 20770 Hwy 281N Suite #108-421, San Antonio, Texas 78258.

2. The amount reflects the balance due for the Statement of Work for Child and Youth Services' School Fiscal Year 2023-2024 to expansion of services to continue supporting 4-H Military Partnership Programs for Active Army, Guard and Reserve for all services.

3. The funding for this is IB1-JG-08-GL-686.

4. The Point of Contact (POC) for this funding authority is: CYS Financial Program Manager, Ms. Janet Yamanaka, (210) 466-1082, janet.p.yamanaka.naf@army.mil.

SUZANNE V. KING
Chief, Child and Youth Services
IMCOM G9

FUNDS AUTHORIZED



*Received by DFAS Texarkana from NAF 11/29/2022 12:38:44*

MelloDiscovery_011427

Additionally, the Defendant also represented that CHYLD was an educational organization. The memo provided above includes language indicating CHYLD was to be paid

based on a statement of work for "School" related services, which indicates the Defendant represented CHYLD was an educational organization. Based on the foregoing, the Government's objection should be sustained and an additional two levels should be added.

## 2. Government's Guideline Calculation

Should the Court sustain the Government's objection, the Government calculates the Defendant's Guideline range on the Mail Fraud charges as follows:

| Base Offense Level | 7 | 2B1.1(a)(1) |
|---|---|---|
| Intended Loss - $117 Million | +24 | 2B1.1(b)(1)(M) |
| Acting on Behalf of Government Agency or Educational Organization | +2 | 2B1.1(b)(9)(A) |
| Sophisticated Means | +2 | 2B1.1(b)(10)(C) |
| Use of Authentication Feature | +2 | 2B1.1(b)(11)(C)(i) |
| Position of Public Trust | +2 | 3B1.3 |
| Zero Point Offender | -2 | 4C1.1 |
|  |  |  |
| Total | 37 |  |
| CRIM HIST | I |  |
| Suggested Sentence without Acceptance | 37/I (210-262) |  |
| Suggested Sentence with Acceptance | 34/I (151-188) |  |

If the Court sustains the Government's objection, an offense level increase according to 3D1.4 applies. The offense level for the Mail Fraud charges prior to the application of Section 4C1.1 and credit for Acceptance of Responsibility is 39. This is only seven levels more than the offense level for the Tax charges (32). (PSR ¶72.) Therefore, one unit is added for the Mail Fraud group and an additional half unit is added for the Tax group. U.S.S.G. § 3D1.4(a), (b). As a result, one additional offense level is added, resulting in a total offense level of 40. With the Zero-Point-Offender deduction and Acceptance of Responsibility, the offense level is reduced to 35, and the Guideline range is 168 to 210 months.

### B. 18 U.S.C. § 3553(a) FACTORS

In determining a sentence, courts are required to consider the factors set forth in Title 18, United States Code, Section 3553(a). While the Court should consider all of the factors, three of the factors are particularly important in this case: (1) "the nature and circumstances of the offense;" (2) the need "to reflect the seriousness of the offense" and deter similar criminal conduct; and (3) the avoidance of sentencing disparities between this Defendant and other similarly situated defendants. 18 U.S.C. § 3553(a)(1, 2, 6).

Because the Sentencing Guidelines are advisory, courts can impose a sentence outside the advisory Guideline range if a variance is supported by careful consideration of the Section 3533(a) factors. 18 U.S.C. § 3553(b)(1); *United States v. Booker*, 543 U.S. 220, 246 (2005); *Gall v. United States*, 552 U.S. 38, 51 (2007). The Supreme Court has explicitly rejected the idea that the sentencing court must base any variance on "extraordinary circumstances" or rote mathematical calculations. *Gall*, 552 U.S. at 47. Based on proper consideration of the 3553(a) factors as discussed more fully below, a variance above the calculated guideline range is appropriate. The Sentencing Guidelines do not properly account for multiple aggravating circumstances presented in this case, including the duration of this fraud, the betrayal of trust committed by the Defendant, and the shocking way in which the money, originally meant for the children of American soldiers, was spent. See 18 U.S.C. § 3553(b)(1).

Therefore, the Government requests the Court order Defendant to serve a sentence of imprisonment of 235 months, which amounts to 25-month increase to the high-end of the calculated Guideline range.

### 1. Nature and Circumstances of the Offense

### i. The Scheme

On its face, it may seem the scheme perpetrated by the Defendant over six years was largely the product of lackadaisical behavior and poor practices within the bureaucracy that is the United States military. While there were certainly vulnerabilities baked into the operational structure at IMCOM and problems with the way in which DFAS audited payments to contractors, to say the loss here is due to bureaucratic shortfalls is an oversimplification at best and is overtly dishonest at worst. The reality is that this scheme was the product of careful planning by the Defendant accompanied by the betrayal of the years of trust she had accumulated with her supervisors and co-workers at IMCOM. Indeed, more than one person told agents the Defendant was the subject-matter expert when it came to the distribution of funds to CYS contractors. According to the PSR, the Defendant's 2014 performance evaluation indicated "[The Defendant] serves as the primary individual to handle all budget concerns and payments for CYS." (PSR at ¶109)

She took the trust she had earned through her years with IMCOM and used it to satisfy her own selfish desires. Like any common criminal, she took this accumulated trust and subject-matter expertise and used it to manufacture for herself the life she wanted, the life she thought she deserved.

The process for securing payment from DFAS for a particular CYS contractor required the compiling of a packet of information. Many of the documents in the packet required the signature of supervisors. Additionally, the final memorandum for the packet authorizing the distribution of the funds to the contractor required the signature of the Defendant's supervisor. By way of example, the memo associated with Count 5 of the Information is included below.



**DEPARTMENT OF THE ARMY**
US ARMY INSTALLATION MANAGEMENT
COMMAND 2405 GUM SHED ROAD
JOINT BASE SAN ANTONIO FORT SAM HOUSTON, TX
78234-1223

AMIM-WRC                                                                          28 NOV 2022

FOR EXPANSION OF MILITARY PARTNERSHIPS

SUBJECT: IB1 Funding Authorization for Military Youth Partnerships # 23-063

1. Request a check be made in the amount of $5,864,669.44 to Child, Health, and Youth Lifelong Learning Development from the Installation Management Command (IMCOM) MWR Fund (IB1). Please send FEDEX to Child, Health and Youth Lifelong Learning Development Office, 20770 Hwy 281N Suite #108-421, San Antonio, Texas 78258.

2. The amount reflects the balance due for the Statement of Work for Child and Youth Services' School Fiscal Year 2023-2024 to expansion of services to continue supporting 4-H Military Partnership Programs for Active Army, Guard and Reserve for all services.

3. The funding for this is IB1-JG-08-GL-686.

4. The Point of Contact (POC) for this funding authority is: CYS Financial Program Manager, Ms. Janet Yamanaka, (210) 466-1082, janet.p.yamanaka.naf@army.mil.

*Suzanne V King*

K
ING.SUZANNE.VI
RGINIA.100828003
3
**SUZANNE V. KING**
Chief, Child and Youth Services
IMCOM G9

FUNDS AUTHORIZED
*Janet P. Yamanaka*
YAMANAKA.JANE
PAULINE.1184981
442

Received by DFAS Texarkana from NAF 11/28/2022 12:38:44

MelloDiscovery_011427

For several of the memos submitted to DFAS, the Defendant, without authorization, copied her supervisor's digital signature from a legitimate document and pasted it on to the fraudulent memo. The time stamps associated with the signatures show that the signature on the memo authorizing payment to CHYLD was fraudulent. As shown below, the legitimate document and the fraudulent Count 5 memo were ostensibly signed at the exact same hour, minute and second: November 16, 2022 at 13:29:04. However, it is impossible to sign two documents with a digital signature at the exact same second. This proves the signature on the memo in Count 5 was fraudulently pasted onto the Count 5 memo by the Defendant.

|  Legitimate Signature | Fraudulent Signature |
| --- | --- |



Moreover, during an interview with agents in December 2023, Suzanne King told agents that she never included both a hand-written signature and digital signature on documents she signed. This further confirms the signature on the Count 5 memo was fake. Additional fraudulent signatures were placed on various documents by the Defendant to facilitate this fraud.

In addition to the fraudulent signatures, from the beginning, the Defendant took steps to make CHYLD look like a legitimate operation. On December 15, 2016, she filed an Assumed Name Certificate in Bexar County. The certificate indicated she was operating as a sole proprietorship and doing business as CHYLD. This was just two days after she submitted her first fraudulent payment request of $1.4 million to DFAS. Additionally, she listed her address as a UPS Store P.O. box and, when asked on the certificate for her residential address she indicated "same," another false representation. The use of a P.O. box was just another step taken by the Defendant to make her scheme appear to be on the up and up.



**Gerard Rickhoff**

COUNTY CLERK     BEXAR COUNTY     DOC# 20160522773

### ASSUMED NAME CERTIFICATE

FOR AN UNINCORPORATED BUSINESS OR PROFESSIONAL NAME OTHER THAN A LIMITED PARTNERSHIP, REGISTERED LIMITED LIABILITY COMPANY

PURSUANT TO THE PROVISIONS OF CHAPTER 71, BUSINESS AND COMMERCE CODE OF THE STATE OF TEXAS, THE UNDERSIGNED CERTIFIES THE FOLLOWING:

| ASSUMED NAME | BUSINESS ADDRESS |
|---|---|
| Child Health and Youth Lifelong Development | 17460 I-35 N, Ste 430-327<br>Schertz, TX 78154 |

BUSINESS OR PROFESSIONAL SERVICES IS BEING/WILL BE CONDUCTED/RENDERED AS A:

A. __XX__ PROPRIETORSHIP    B. _____ PARTNERSHIP    C. _____ REAL ESTATE INVESTMENT TRUST

D. _____ JOINT STOCK COMPANY

E. _____ OTHER FORM OF UNINCORPORATED BUSINESS OR PROFESSIONAL ASSOCIATION.

| REGISTRANT(S) NAME(S) | RESIDENCE ADDRESS(ES) |
|---|---|
| Janet Pauline Yamanaka | same |

THE PERIOD, NOT TO EXCEED TEN YEARS, DURING WHICH THE ASSUMED NAME WILL BE USED, IS FROM THE DATE FILED WITH THE COUNTY CLERK.

IN TESTIMONY WHEREOF OF __I__ HAVE HEREUNTO SET __My__ HAND(S) THIS THE __15__ DAY OF __Dec__ A.D. 20 _16_

_Janet Pauline Yamanaka_ SIGNATURES

Janet Pauline Yamanaka

STATE OF TEXAS §
COUNTY OF BEXAR §

BEFORE ME THE UNDERSIGNED AUTHORITY, ON THIS DAY PERSONALLY APPEARED

Janet Pauline Yamanaka

KNOWN TO ME TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED TO THE FOREGOING CERTIFICATE AND ACKNOWLEDGE TO ME THAT ___S HE___ EXECUTED THE SAME FOR THE PURPOSE AND CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE __15__ DAY OF __Dec__ A.D. 20 _16_

NOTARY PUBLIC, STATE OF TEXAS
OR BY:
GERARD RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

CHRISTINA CARDEN
Notary Public State of Texas
My Commission Expires
December 04, 2019

NOTE: A CERTIFICATE EXECUTED AND ACKNOWLEDGED BY AN ATTORNEY-IN-FACT SHALL INCLUDE A STATEMENT THAT THE ATTORNEY-IN-FACT HAS BEEN DULY AUTHORIZED IN WRITING BY HIS PRINCIPAL TO EXECUTE AND ACKNOWLEDGE THE SAME.

After that initial submission in December 2016 and after receiving the first check from DFAS on or about January 5, 2017, the Defendant opened "Business" accounts at Wells Fargo. In so doing, the Defendant tried to make it appear to the bank CHYLD was an actual business. The Defendant did the same in opening Bank of America accounts for CHYLD in August 2017.

Even as late as June 2023, the Defendant was taking steps to further conceal her illegal activity. Since the Defendant initiated her scheme in December 2016, the Defendant "operated" as a sole proprietorship, doing business as CHYLD. In June 2023, she made a change. In an attempt to make her scheme appear legitimate, the Defendant registered Child Health and Youth Lifelong Learning (CHYLD), LLC with the state of Texas.



**Form 205**
**(Revised 12/21)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555

Filing Fee: $300

This space reserved for office use.

**Certificate of Formation**
**Limited Liability Company**

### Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

Child Health and Youth Lifelong Learning (CHYLD), LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

### Article 2 – Registered Agent and Registered Office

(See instructions. Select and complete either A or B and complete C.)

☐ A. The initial registered agent is an organization (cannot be entity named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

| Janet | | Mello | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

C. The business address of the registered agent and the registered office address is:

| 4051 Fossil Forest | San Antonio | TX | 78261 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

### Article 3—Governing Authority

(Select and complete either A or B and provide the name and address of each initial governing person.)

☐ A. The limited liability company initially has managers. The name and address of each manager are set forth below.

☑ B. The limited liability company does not initially have managers. The name and address of each initial member are set forth below.

**INITIAL GOVERNING PERSON 1**
NAME (Enter the name of either an individual or an organization, but not both.)
IF INDIVIDUAL

| Janet | | Mello | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

**OR**
IF ORGANIZATION

Organization Name

**ADDRESS**

| 4051 Fossil Forest | San Antonio | TX | US | 78261 |
|---|---|---|---|---|
| Street or Mailing Address | City | State | Country | Zip Code |

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned also affirms that, to the best knowledge of the undersigned, the name provided as the name of the filing entity does not falsely imply an affiliation with a governmental entity. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: 06/04/2023

*Janet Y. Mello*

Signature of organizer

Janet Mello

Printed or typed name of organizer

Mello also attempted to conceal her wrongdoing in the filing of her taxes. In 2017, despite receiving nearly $18 million in fraudulently procured funds, the Defendant claimed business income of $483 on her tax return. She also falsely claimed to be a "Training consultant." In subsequent years, she claimed no business income at all. Again, she was consistently and consciously concealing her illegal activity.

| | | | | |
|---|---|---|---|---|
| **A** Principal business or profession, including product or service<br>Training Consultant | | | **B** Enter business code (see page 2)<br>▶ 541600 | |
| **C** Business name. If no separate business name, leave blank. | | | **D** Enter your EIN (see page 2)<br>81-4588169 | |
| **E** Business address (including suite or room no.). Address not required if same as on page 1 of your tax return.<br>4051 Fossil Forest | | | | |
| City, town or post office, state, and ZIP code<br>San Antonio, TX  78261 | | | | |
| **F** Did you make any payments in 2017 that would require you to file Form(s) 1099 (see the Schedule C instructions) . . . . . . . . . . . . . . . . . . . . . | | | ☐ Yes | ☑ No |
| **G** If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . | | | ☐ Yes | ☐ No |

**Part II    Figure Your Net Profit**

| | | |
|---|---|---|
| **1** Gross receipts. **Caution:** If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see *Statutory employees* in the instructions for Schedule C, line 1, and check here . . . . . ▶ ☐ | **1** | 2,152 |
| **2** Total expenses (see page 2). If more than $5,000, you **must** use Schedule C . . . . . . . . | **2** | 1,669 |
| **3** Net profit. Subtract line 2 from line 1. If less than zero, you **must** use Schedule C. Enter on both **Form 1040, line 12, and Schedule SE, line 2,** or on **Form 1040NR, line 13, and Schedule SE, line 2** (see instructions). (Statutory employees **do not** report this amount on Schedule SE, line 2.) Estates and trusts, enter on **Form 1041, line 3** . . . . . . . . . . . . . . . . | **3** | 483 |

Finally, in August 2023, agents executed a search warrant at the Fossil Forest home wherein they found much of the jewelry and many of the vehicles purchased by the Defendant. During the search, the Defendant agreed to a consensual interview with agents. Initially, the Defendant denied any affiliation with CHYLD other than being the point of contact for the vendor. However, when agents confronted her with evidence that she owned and controlled CHYLD, she admitted to the fraudulent nature of the scheme. Even while agents were searching her home, the Defendant was still trying to conceal her involvement. She only admitted her wrongdoing and began to cooperate with authorities after she was confronted with overwhelming evidence of her guilt.

This was thoughtful. This was planned. This was not, "Well, nobody is looking. Let's see what happens." The nature and circumstances of this offense show that the Defendant was not simply acting out of her grief. The nature and circumstances of this offense show this crime was not the result of holes in a bureaucratic system. This crime was a product of six years of careful execution and calculated steps the Defendant took to conceal her theft. A sentence of 235 months is appropriate.

### ii. Defendant's Spending

An additional pertinent consideration regarding the nature and circumstances of this offense is the way in which the money was spent. As noted above, the Defendant spent the money she stole on various items, including jewelry, vehicles, and real estate. Included below are some examples of her extravagant spending.

**Real Property**

The Defendant and her husband bought at least thirty-one pieces of real estate across the country. The current estimated value of the Mellos' real estate portfolio is $23 million. In addition to building a multi-million-dollar property in the San Antonio area, the MELLOs purchased multi-million-dollar properties in Denver, CO, Preston, MD and Canyon Lake, TX.

**28860 Verde Mountain Trial**



In April and May 2017, just a few months after initiating the fraud scheme, the Defendant and her husband purchased a fourteen-acre lot and the neighboring five-acre lot in Verde Mountain Estates, located at 28860 and 28830 Verde Mountain Trail in San Antonio. They paid approximately $404,000 cash for the properties. Later, the Mellos would build a large home on the 28860 lot, a home that remains unfinished.

**4051 Fossil Forest**



On July 24, 2017, just a few months after initiating the scheme, the Defendant and her husband paid $678,500 cash for a home located at 4051 Fossil Forest Drive in the Stone Oak area. This four bedroom and five bathroom 4,394 square foot home located in the gated Fossil Ridge neighborhood was a major upgrade for the Mellos, who previously lived in a two bedroom and three bathroom 1,900 square foot home. Interestingly, the Mellos removed the Defendant from the closing documents to avoid any issues at closing stemming from her previously filed bankruptcy, a sign of the Mellos' relative sophistication in these types of matters.

Interestingly, just two weeks before closing on the Fossil Forest home, as part of her bankruptcy case, the Defendant completed a debtor education course and filed a certificate indicating the same with the bankruptcy court.



Certificate Number: 01141-TXW-DE-029554197

Bankruptcy Case Number: 12-51926

01141-TXW-DE-029554197

**CERTIFICATE OF DEBTOR EDUCATION**

I CERTIFY that on July 10, 2017, at 1:34 o'clock PM EDT, Janet P Yamanaka completed a course on personal financial management given by internet by American Consumer Credit Counseling, Inc., a provider approved pursuant to 11 U.S.C. § 111 to provide an instructional course concerning personal financial management in the Western District of Texas.

The Defendant's bankruptcy case was discharged by the bankruptcy court on August 7, 2017. The Government currently has no information indicating the Defendant reported to the bankruptcy court the millions of dollars she had received to that point in 2017.

**5524 Lemon Gulch Rd., Castle Rock, CO**



In October 2022, the Mellos purchased the property located at 5524 Lemon Gulch Road in Castle Rock, Colorado. The property sits on thirty-five acres, is over 7,000 square feet and has four bedrooms and four and a half bathrooms. In keeping with a theme at these larger properties purchased by the Mellos, the home also boasted five garages. The Mellos paid $2.3 million cash

for the property.[2]

<strong>158 Acres Canyon Lake, Texas</strong>

In November 2022, the Mellos paid $3.3 million cash for adjoining properties in Canyon Lake, Texas. The two properties covered a total of 158 acres.

<strong>Preston, MD</strong>





[2] All images are publicly available at https://www.realtor.com/realestateandhomes-detail/5524-Lemon-Gulch Rd_Castle-Rock_CO_80108_M14995-07349









As the final jewel in their real estate crown, the Mellos purchased a sprawling 58-acre estate in July 2023 in the rural farming community of Preston, Maryland. The estate included a 9,300 square foot, eight bedroom and twelve-bathroom home.[3] The property also included multiple garages, in which the Mellos apparently planned to house at least part of their extensive automobile and motorcycle collection. The Mellos paid approximately $3.1 million cash for the property. Fortunately, before the Mellos had much time to feast on this particular piece of criminal fruit, agents with the IRS and Army Criminal Investigations Division (CID) executed a search warrant at the Mello's Fossil Forrest home in late August 2023.

**Vehicles**

The Mellos' purchases of homes with voluminous garage space was necessitated by their rampant purchasing of vehicles. During the course of the scheme, the Mellos purchased a fleet of at least eighty-two different vehicles, including cars, SUVs, motorcycles, and at least one motorhome. When agents executed the search warrant at the Fossil Forest home in August 2023, they found many of the vehicles with dead batteries due to the fact they had not been operated in a significant amount of time. Photos of some of the vehicles purchased are included below. The estimated value of the vehicles purchased is approximately $3.5 million.

---

[3] All images are publicly available at https://vimeo.com/756580716 and https://www.realtor.com/realestateandhomes-detail/4218-Harmony-Rd_Preston_MD_21655_M93207-76571.

**1905 Indian Prince - $37,000**



**1955 Ferrari Fratelli 165 Racer - $34,000**



**1953 Maserati 125 GT Racer - $8,000**



**1966 BMW R69S - $34,000**



**1993 Land Rover Defender - $155,000**



**1911 Harley Davidson 7 Single – $65,000**



**2023 Land Rover Range Rover $239,960**



**2022 Mercedes Benz GLS-63 - $130,000**



**2018 Maserati Gran Turismo - $129,000**



**2023 Land Rover Defender - $129,000**



**1954 Chevrolet Corvette - $120,000**



**Jewelry**

In addition to real estate and vehicles, the Defendant spent millions on high-end jewelry. On December 4, 2022 alone, the Defendant spent over $923,000 on jewelry. Examples of some of the pieces purchased are included below.









### iii.    $108 Million in Context

While the items referenced above give some perspective on the amount of money stolen by the Defendant, it is difficult to wrap one's head around the idea of $108 million. To provide some perspective consider that in its fiscal year 2024 proposed budget, the Army included the allocation of funds for the building of a Child Development Center at Fort Gordon, Georgia (now Fort Eisenhower). According to the Child and Youth Services Garrison Leaders Guide, Child Development Centers offer daycare services for young children, provide developmental activities, and provide healthy meals, snacks and outdoor recreation.[4] The listed cost for the building of the Center was $21 million.[5] The amount of money stolen by the Defendant was enough to build five of these Centers.

(2) The table referred to in paragraph (1) is as follows:

**Army: Extension of 2021 Project Authorization**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Georgia | Fort Gordon | Child Development Center | $21,000,000 |

---

[4] https://www.mwrbrandcentral.com/application/files/6916/3223/4748/CYS_Garrision_Commanders_7x8.5_SEP16.pdf
[5] https://www.asafm.army.mil/Portals/72/Documents/BudgetMaterial/2024/Base%20Budget/Military%20Construction/Regular%20Army%20Military%20Construction%20Army,%20Army%20Family%20Housing%20and%20Homeowners%20Assistance.pdf

Like any common criminal, the Defendant lied to and betrayed those closest to her in order to get what she wanted. The Defendant used the money she stole to enrich herself, rather than direct it to provide for the care and comfort of military-connected youth as intended. What makes this case unique is the shockingly extravagant way in which the Defendant spent her ill-gotten gains. This level of extravagance necessitates a commensurate sentence. Based on the nature and circumstances of the offenses, including the methods employed, the amount stolen and how the stolen funds were spent by the Defendant, a sentence of 235 months is appropriate.

### 2. Seriousness of the Offense and Deterrence of Similar Criminal Conduct

A sentence of 235 months is also appropriate because it shows the seriousness of the offense and will deter similar conduct. The government is a tempting target for fraudsters. Some of the largest cases in the San Antonio division involve individuals stealing money from the government through various types of bribery and procurement schemes. It is important for the public and for others who may commit these types of white-collar crimes to see that the proverbial juice is not worth the squeeze. In other words, an individual planning to perpetrate a fraud scheme should not see the possible criminal punishment as simply a cost of doing business. *See United States v. Hoffman*, 901 F.3d 523, 556 (5th Cir. 2018), *as revised* (Aug. 28, 2018) (noting that Congress, by creating the Sentencing Commission, sought to eliminate the belief that white collar cases, as opposed to "blue collar" cases, were only punished with a relatively small fine and little to no prison time).

While the Defendant's scheme did not involve as many participants and, while sophisticated in its own way, may be not as complex as other schemes prosecuted in the San Antonio Division, it remains one of the largest frauds in the history of this Division by loss amont. The fact that a single individual executed this scheme should not affect the Court's evaluation of

the seriousness of the offense. The sentence here should send a message to the Defendant and others that may commit fraud in the future that this type of fraud will not be tolerated and will be punished harshly. A sentence of 235 months does just that.

### 3. The Avoidance of Sentencing Disparities

As noted above, the Defendant committed what may be the largest fraud by dollar amount in the history of the San Antonio Division, if not the entire Western District of Texas. The sentence imposed should reflect the same, and, when compared to recent sentences imposed in large fraud schemes prosecuted in this Division, as well as sentences imposed on defendants in other districts who executed schemes with large loss amounts, a sentence of 235 months is wholly appropriate.

#### *U.S. v. Seguin, et al* – 5:19-CR-00788-DAE

Seguin and his co-defendants engaged in a procurement fraud scheme in which bribes were paid to Seguin in exchange for the rewarding of U.S. Air Force contracts to businesses owned and controlled by his co-conspirators. On April 24, 2023, Seguin was sentenced to 188 months imprisonment and ordered to pay $37 million in restitution jointly and severally with his co-defendants.

#### *U.S. v. Pettit* – 5:22-CR-00653-OLG

In *Pettit*, the defendant, a lawyer, orchestrated a Ponzi scheme that victimized dozens of people, including many of his close associates, making his crime especially egregious. While a final determination as to the total loss attributable to the scheme is pending, the parties agreed the loss is in the $20 million to $60 million range. On February 21, 2024, Judge Garcia sentenced Pettit to 600 months imprisonment.

#### *U.S. v. Borgesano, et al* - 8:16-CR-00353-JSM

In *Borgesano¸* a case out of the Middle District of Florida, the defendants conspired to

defraud Medicare, Tricare and private insurers through a prescription fraud scheme. The lead defendant, Borgesano, was ordered to pay over $54 million in restitution. He was sentenced to a total of 180 months in prison.

While the facts in these cases are admittedly different than the facts in this case, the amounts involved and the sentences imposed justify the 235-month sentence requested by the Government here. Specifically, the restitution ordered in *Seguin* and *Borgesano* was far less than the nearly $109 million the Defendant has agreed to here. Yet, the lead defendants in those cases still received sentences of at least 180 months. Given the large loss in this case and considering the fifty-year sentence handed down in *Pettit*, a sentence of 235 months is more than reasonable and would avoid unwanted sentencing disparities.

## C. CONSIDERATION OF POTENTIAL RECOVERY

The Court should not consider any potential recover by the Government in determining the appropriate sentence in this case. The Government seized and the Defendant has agreed to forfeit millions of dollars' worth of cash, real estate, jewelry and vehicles purchased by the Defendant during the course of her fraudulent conduct. While the Government could recover a significant amount of what was stolen by the Defendant from the sale of these items, given market fluctuations and other economic forces, there is no guarantee as to how much the Government will actually recover. Additionally, it is the loss that is the primary determination for an appropriate sentence because loss provides the clearest picture of a defendant's criminal intent. It is this Defendant's criminal intent that is being punished here, and her intent remains the same regardless of any recovery by the Government. Therefore, the Court should not consider any potential recovery by the Government in determining the appropriate sentence in this case.

The Sentencing Guidelines largely use loss amount to determine the appropriate offense

level in cases of financial fraud. *See Hoffman*, 901 F.3d at 558 (citing U.S.S.G. § 2B1.1(a), (b) app. note 3(A) & 3(A)(ii)). The loss amount includes not only the actual loss, but also the total loss intended by the Defendant. *Id.* This is primarily because the intended loss gives the most accurate picture of a defendant's criminal intent. *See Hoffman*, 901 F.3d at 558 (noting that the amount of loss intended by the defendant is the best measure of the defendant's criminal intent for purposes of sentencing, not the actual loss suffered by the victim, even when that victim is the government).

In *Hoffman*, the defendants engaged in a scheme to defraud the state of Louisiana. *Hoffman*, 901 F.3d at 532-35. The scheme involved tax credits issued by the state to businesses engaged in the Louisiana film industry. *Id.* Approximately $6 million in tax credits were issued to the defendants' companies based on misrepresentations made by the defendants regarding expenses incurred. *Id.* This was about $2 million more than the defendants should have received. *Id.* at 558. The district court imposed a probation only sentence for each of the defendants, including the lead defendant who had a calculated Guideline range of 168 to 210 months. *Id.* at 536, 555. The district court reasoned that since the lead defendant's prior conviction was a misdemeanor, he was in poor health, and, most importantly, there was no real loss to the state of Louisiana, a probation only sentence was appropriate. *Id.* at 556.

The Fifth Circuit determined the trial court abused its discretion and granted a much larger downward variance than was appropriate under the circumstances, even considering the mitigating fact that the financial harm to the victim was minimal. *Id.* at 554, 559. The Fifth Circuit reasoned that the District Court did not properly consider the Section 3553(a) factors as required. *Id.* at 556-59. In particular, the Fifth Circuit noted that the trial court failed to properly consider the deterrent effect of a probation-only sentence, the nature and circumstances of the offense, including the

intended loss, and the calculated Guideline range. *Id.*

Regarding the nature and circumstances of the offense and the loss amount in particular, the Court determined the District Court erred in looking only to the actual loss sustained by the state, which was minimal. *Id.* at 557-58. The Court noted that intended loss is the more accurate measure of a defendant's criminal intent, which is why the Guidelines direct courts to use intended loss rather than actual loss when intended loss is higher. *Id.* at 558. Additionally, the Court recognized Congress's decision to criminalize the inchoate crime of attempt reflects its intent to punish the full scope of a defendant's criminal intent, even when no actual harm is suffered. *Id.* Notably, the Court pointed out that "the state's vigilance in discovering the circular transactions and phony expenditures" should not work as a credit to the defendant. *Id.* at 559.

Regarding the deterrent effect of a probation-only sentence, the Court noted that the Court and Congress have both made clear their respective distaste for low sentences in white-collar cases. *Id.* at 556 (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)) (sentencing white-collar criminals to "'little or no imprisonment . . . creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.'") Contrary to crimes committed without much forethought or in the "heat of passion," the calculated nature of a white collar crime suggests that a person considering a white collar, criminal undertaking may take the time to consider any potential punishment, making deterrence a factor that should be weighed more heavily in white collar cases. *Hoffman*, 901 F.3d at 556. The Court also reasoned that low sentences in white-collar cases give the impression that there are different systems of justice for rich, white-collar defendants and poor "blue-collar" defendants, which undermines peoples' confidence in the justice system. *Id.* at 557.

Here, the Court should not impose anything less than a 235-month sentence, much less

depart downward from the calculated Guideline range. As noted in *Hoffman*, the Court should consider the intended loss, not the Government's actual loss, because intended loss is the best reflection of this Defendant's culpability. *Id.* at 558. Agents' detection of this crime and the diligence of IRS agents, Army CID agents and attorneys and staff in the Asset Forfeiture and Financial Litigation Units in the United States Attorney's Office in recovering assets should not be treated as some kind of credit to the Defendant, which is exactly what would happen if the Court considers offsets the intended loss with the Government's potential recovery in this case. *Id.* at 559 ("Only the state's vigilance in discovering the circular transactions and phony expenditures kept it from being cheated out of the additional millions."). Additionally, no consideration should be given to the Defendant's agreement to forfeit the assets purchased with her criminal proceeds, except that to which she is entitled under the Guidelines because of her acceptance of responsibility. See U.S.S.G. § 3E1.1(a), (b) App. Note 1(C), (E). Such considerations would not fully account for the criminal intent of the Defendant, which is what is being punished here. *Hoffman*, 901 F.3d at 558.

This Defendant had many years to consider the consequences of her actions, and she chose to move forward, getting more daring and requesting larger amounts as time went on. A person considering the same or similar conduct should not be able to look at this case and determine any risk is worth the reward. Accordingly, full consideration of the intended loss amount is proper, and a sentence of 235 months is more than justified.

## CONCLUSION

The Court should sustain its objection to the calculation of the Guideline range in the PSR and impose a sentence of imprisonment of 235 months in this case, in addition to the restitution, money judgment, and forfeiture agreed to by the parties and any term of supervised release

recommended by Probation. The nature and circumstances of the offenses, including the Defendant's deceptive acts and extravagant spending necessitate the upward variance requested. Additionally, such a punishment will avoid unwanted sentencing disparities given sentences imposed in other large fraud schemes in this and other districts. Finally, the Defendant should not receive a discount based on any potential recovery by the Government. Such consideration would not properly account for the full scope of the Defendant's criminal intent and would communicate to the public and other would-be fraudsters that the risk of committing this type of crime may be worth the reward. For these reasons, the Government requests that the Court impose a sentence of imprisonment of 235 months.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY

BY:  ____/s/_____
JUSTIN R. SIMMONS
Assistant U.S. Attorney
Texas Bar # 24097084
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7422
Justin.Simmons@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July 2024, a true and correct copy of the foregoing instrument was served via ECF.

____/s/_____
JUSTIN R. SIMMONS
Assistant United States Attorney